OPINION OF THE COURT
John A. Leary, J.
Petitioners Kathleen and Kenneth Campney commenced this proceeding on February 8, 1982 for an order, pursuant to section 652 of the Family Court Act, awarding custody of infant Abel Ayala to petitioners.
The respondents, Manuel and Juanita Ayala, are the petitioners in a proceeding in Superior Court, Modoc County, California, wherein they sought an order for a writ of habeas corpus on January 14, 1982 and prayed for an order awarding custody to petitioners Ayala.
It appears from the record that the petition for writ of habeas corpus and the order for writ to issue were duly served upon the Campneys on January 21, 1982 in Washington County, New York.
*382 Ón February 1, 1982 the Superior Court of Modoc County awarded custody to the Ayalas. There was no appearance by the Campneys.
The papers before the court indicate that the child was placed with the Campneys by Mrs. Ayala for what was intended to be a period of several weeks while Mrs. Ayala journeyed to Mexico to visit her ailing mother. It does not appear that Mr. Ayala was involved in the placement or subsequent communication. At that time, both Campneys and Ayalas were residing in California. Subsequently, on November 7, 1979, Mrs. Campney wrote to Mrs. Ayala informing the latter that the Campneys, with Abel Ayala, were moving on November 8, 1979 from Tulelake, California, to Santa Ana, California, “for a while” in order to obtain work. Mrs. Campney, in that letter, requested a birth certificate and “shot record” in order to place Abel Ayala in school. The return address for correspondence to the Campneys was stated as general delivery, Tustin, California. The envelope allegedly containing the letter was curiously postmarked “Reno, NV” on November 8, 1979.
On December 4, 1979, Mrs. Campney wrote Mrs. Ayala from Granville, New York, explaining that the Campneys returned to New York with Abel Ayala owing to the illness of Mr. Campney’s father. The letter contained a renewed request for a birth certificate and “shot record”. There followed a period of correspondence between Campney and Ayala until approximately August 4, 1981 when Mrs. Campney alleged by letter of that date that Abel Ayala wanted to be adopted by the Campneys. At about the same time, Mrs. Ayala contacted a Legal Aid office in California for assistance. Subsequently, a private law firm in Sacramento represented the Ayalas pro bono and commenced the California action in January, 1982.
It is arguable that both New York and California could exercise jurisdiction in the first instance. Section 75-d of the Domestic Relations Law provides substance for petitioner and respondent in the instant action.
The Ayalas residing in California are possibly within the ambit of section 75-d (subd 1, par [b]) of the Domestic Relations Law while the Campneys have argued that the *383 child was abandoned in order to meet the criteria of section 75-d (subd 1, par [c]) in addition to paragraphs (a) and (b) of subdivision 1.
The record before the court is inconsistent with the allegations of child abandonment or emergency. In addition, the court rejects the contention that this State is the home State of the child at the time of commencement of the proceeding. Subdivision 5 of section 75-c of the Domestic Relations Law requires that the child be residing with a person acting as parent for at least six months prior to commencement of the proceeding. Subdivision 9 of section 75-c of the Domestic Relations Law defines “ ‘Person acting as parent’ ” as “a person, other than a parent, who has physical custody of a child * * * claims a right to custody”.
For a nonparent to have a valid claim for a right to custody there must be some basis for that claim other than mere physical custody or “actual possession and control of a child” (Domestic Relations Law, § 75-c, subd 8).
Otherwise, any interloper could assert such a claim merely by seizing a child. The thrust of section 75-d (subd 1, par [a]) of the Domestic Relations Law seems to require an underlying substantive right in the light of the negative implications of section 75-i of the Domestic Relations Law.
It is recognized that conduct of a petitioner which falls within the ambit of section 75-i of the Domestic Relations Law does not deprive the court of jurisdiction nor does the absence of “clean hands” negate consideration of the best • interest of the child. However, section 75-b (subd 1, par [e]) of the Domestic Relations Law clearly indicates that unilateral removals or abductions are to be adversely viewed by the court.
The allegation of foster parentage in the Campney petition is considered unwarranted and presumptuous, as it is generally viewed that a foster parent is an adoptive parent.
One must also consider the effect of sections 75-o and 75-h of the Domestic Relations Law. It is clear that the California statute is substantially the same as that of New York and that jurisdiction was exercised by the California court in the same manner as would a New York court under similar circumstances. Although section 75-h of the *384 Domestic Relations Law confers the power to modify the California court decree, section 75-h (subd 3, par [e]) of the Domestic Relations Law clearly states that modification should not be made where doing so would controvert the intent of the Uniform Child Custody Jurisdiction Act (UCCJA; Domestic Relations Law, art 5-a) as stated in section 75-b of the Domestic Relations Law.
Moreover, we are faced with an order from a California court which has enacted the UCCJA which purports to award custody to the respondents in this action.
Does that order preclude New York from exercising jurisdiction in the present case?
The answer involves the many considerations previously stated, but most importantly the thrust of subdivision 1 of section 75-g of the Domestic Relations Law which provides that “A court of this state shall not exercise its jurisdiction under this article if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this article” (emphasis supplied).
It must then be ascertained if, in fact, the California proceeding was in substantial conformity with the UCCJA as adopted by New York. It is clear that most of the operative sections of the California statute are verbatim with New York. However, it is true that the California statute, subdivision (2) of section 5154 of the California Civil Code, provides only 10 days’ notice to a respondent while the New York statute, section 75-f of the Domestic Relations Law, provides 20 days.
The Campneys did, in fact, receive 10 days’ notice by personal service in the California action and instead of appearing in the California proceeding commenced this action one week after the entry of an order in the California proceeding. This court takes the position that the notice requirements are not so dissimilar as to prevent the Campneys from appearing in the prior proceeding and, therefore, finds that the California statute is substantially in conformity with the New York article 5-a.
Although there may be a sound predicate for jurisdiction in this State pursuant to section 75-d (subd 1 et seq.), the *385 Court of Appeals in Vanneck v Vanneck (49 NY2d 602) made it clear that section 75-g of the Domestic Relations Law is a prime impetus of section 75-b of the Domestic Relations Law. This court has before it the record of the California court and finds no significant divergence from New York law.
It is the purpose of the UCCJA to discourage State-to-State forum shopping in custody matters and to insure uniformity among the States that enact it, and facilitate the enforcement of custody decrees of other States.
The exercise of jurisdiction by this court would be the antithesis of the intent of section 75-b of the Domestic Relations Law.
Accordingly, the stay of enforcement of the order of the California court is vacated.
Order of California court awarding custody to Manuel and Juanita Ayala is in. full force and effect. Ordered that infant Abel Ayala be returned to custody of his natural parents, Manuel and Juanita Ayala, in compliance with California court order of February 1, 1982.